U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

2021 AUG 26 PM 4: 25

CLERK
BY_____ /s/ law
DEPUTY CLERK

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF A CELLULAR PHONE, FURTHER DESCRIBED IN ATTACHMENT A, CURRENTLY STORED IN BURLINGTON, VERMONT IN THE CUSTODY OF THE BURLINGTON POLICE DEPARTMENT | Case No. 20-MJ-63<br><br>**Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Frank Scalise, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit under F.R.C.P. 41(e)(2)(B) in support of an application for a search warrant for electronically-stored information, further described in Attachment B, for one cellular phone: An Apple iPhone in a black and clear "Otterbox" case (DEVICE 1) which was seized on 08/16/2021 in connection with the arrest of Edward WILLIAMS, and is described with particularity in Attachment A. DEVICE 1 is currently in the custody of the Burlington Police Department in Burlington, Vermont.

2.      I am currently a Task Force Officer (TFO) with the Drug Enforcement Administration (DEA). I was deputized as a federal TFO pursuant to Title 21, United States Code, Section 878 on April 8, 2019, and I am designated by the Attorney General, through approved delegations of authority, to execute and serve search warrants and arrest warrants issued under the authority of the United States. Accordingly, I am serving as a "federal law enforcement officer" as defined in Federal Rule of Criminal Procedure 41(a)(2)(C). Prior to working as a full-time DEA TFO, I was assigned as a Detective at the Milton, Vermont Police Department since February 2015. I have been a certified full-time law enforcement officer with the Milton, Vermont Police

Department since May 2010. I have participated in numerous state and federal investigations into different types of controlled substances and am familiar with the use of cellular telephones associated with their distribution. Through my training and experience, I am familiar with the use and exploitation of cellular telephones by drug dealers and drug users. I know it is common for drug dealers to use multiple different cell phones. I also know it is common for drug dealers to use cellular phones which lack or have illegitimate subscriber information, allowing drug dealers to conduct their illicit activities with anonymity. Furthermore, drug dealers and drug users communicate with their co-conspirators through text messaging, voice calls and other forms of mobile messaging utilizing cellular telephones. I know that cellular telephones are an integral component in the sale/trafficking of illegal drugs.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that the electronically-stored information, further described in Attachment B, contained within DEVICE 1, further described in Attachment A, constitutes evidence and instrumentalities of violations of 21 U.S.C. §§ 841(a)(1), 843, and 846, distribution of, use of communication facility in furtherance of, and conspiracy to distribute controlled substances.

## **PROBABLE CAUSE**

## **CONTROLLED PURCHASE**

5.      In December 2019, members of the DEA Burlington Resident Office (BRO) met with a confidential source (CS)[1] who was in a position to coordinate a meeting of an undercover DEA Special Agent (UC) with an individual it knew as "Grand Dad" who distributed cocaine base in Burlington, Vermont. At the time, law enforcement suspected "Grand Dad" to be Edward WILLIAMS.

6.      On a known date during the month of December 2019, Task Force Officer (TFO) Dwayne Mellis and Special Agent (SA) Timothy Hoffmann met with the CS and the UC at a known location.

7.      At the predetermined location, SA Hoffmann, as witnessed by TFO Mellis, searched the CS for contraband and/or large amounts of United States Currency (USC) and the result was negative. The CS and UC were provided an audio transmitting device and audio/video recorders. TFO Mellis, as witnessed by SA Hoffmann, provided the UC with United States Currency (USC) to conduct the controlled purchase. The CS contacted WILLIAMS via a phone call to 802-383-8151. The CS and UC were monitored as they traveled in a vehicle to the prearranged meet location outside of 42 N. Winooski Ave., Burlington, Vermont. Upon their arrival the CS contacted WILLIAMS via 802-383-8151, and the CS and UC were directed to move to a different location, to avoid police detection in front of 42 N. Winooski Ave. Burlington Police Department Detective Chase Vivori observed a tall black male, later identified as WILLIAMS, exit the common door of 42 N. Winooski Ave. WILLIAMS was observed by

---

[1] The CS has a criminal history to include the following convictions: Domestic Assault (2003); Violation of Probation (2004); Possession of Cocaine (2004); False Information to Law Enforcement Officer/Implicate another (2011); Vehicle Operation License Suspended (2011).

3

surveillance as he walked north on the eastern sidewalk of N. Winooski Ave. towards the CS and UC. SA Kristian Pinkham advised that WILLIAMS was talking with the UC on the driver side of the vehicle and soon after walked to the passenger side of the vehicle. TFO Mellis confirmed the UC and CS were in contact with WILLIAMS via audio transmitter inside the UC and CS's vehicle. The controlled purchase concluded and the CS and UC were escorted to a predetermined meet location by TFO Mellis, SA Hoffmann and Colchester Police Detective Jesse Treier. There, the UC surrendered a clear plastic bag containing three smaller knotted clear plastic bags each containing an off-white, rock-like substance, which appeared consistent with cocaine base. While TFO Mellis, SA Hoffmann and Det. Treier met with the CS and UC, WILLIAMS was observed by surveillance walking back to 42 N. Winooski Ave. Det. Vivori observed WILLIAMS entering into the main door of the apartment building.

       8.      On 01/20/2021, DEA lab testing results confirmed the presence of cocaine base in the substance purchased from WILLIAMS, with a net weight of approximately 7.1 grams.

       9.      I reviewed the audio and video obtained from the controlled purchase, including the video and report of the DEA UC. I compared a Vermont Department of Motor Vehicles photograph for Edward WILLIAMS[2] and found the individual in the video who distributed the cocaine base in the controlled purchase was the same. The report from the UC indicated that the transaction of money for drugs occurred directly through WILLIAMS, which was also documented on video.

---

[2] WILLIAMS has a criminal history to include convictions for: Criminal Sale Controlled Substance-3rd:Narcotic Drug (Felony, New York, 1997); Disorderly Conduct (Misdemeanor, Vermont, 2001); Cocaine Sale or Delivery (Felony, Vermont, 2003); Cocaine Sale or Delivery (Felony, Vermont, 2006)

## ARREST OF EDWARD WILLIAMS

10. On 08/16/2021, DEA TFO Phil Tremblay and I went to 42 N. Winooski Ave., Unit 4, in an attempt to locate WILLIAMS. After knocking, Margo FITZPATRICK opened the door. I was familiar with FITZPATRICK from a previous DEA law enforcement encounter at the same residence. I explained to FITZPATRICK I needed to speak with WILLIAMS. WILLIAMS came to the door and requested to speak inside. When inside, I observed a main living area and one attached bedroom. I explained to WILLIAMS he was under arrest based on drug-related charges. I searched WILLIAMS incident to arrest and located a small piece of white chunky substance, consistent with what I knew to be cocaine base, inside his short pocket.

11. WILLIAMS was transported back to the Burlington Police Department. TFO Tremblay and I processed the suspected cocaine base, which I located in WILLIAM's pocket incident to arrest. I found the suspected cocaine base weighed approximately 0.2 grams, and a field test yielded a presumptive positive for the presence of cocaine.

12. TFO Tremblay and I participated in the post-arrest interview of WILLIAMS. I read WILLIAMS his *Miranda Warnings*. WILLIAMS had questions related to whether he would be incarcerated or not. I explained to WILLIAMS it was his choice to speak with me, and I would further speak with a prosecutor regarding his interview. WILLIAMS agreed to waive his rights, signing the waiver. During the interview, WILLIAMS provided the following details regarding his participation in drug use and distribution. WILLIAMS uses cocaine base, and has been doing so for approximately 30 years. WILLIAMS explained the only time he was not using cocaine base was when he was incarcerated. WILLIAMS said he does not "sell" drugs, however, if someone he knows asks him for cocaine base, he will take their money, find a source of supply for cocaine base, and pay that person in exchange for the cocaine base. WILLIAMS said he will

then take some of the cocaine base for himself, and provide the rest to the person who requested it initially. WILLIAMS explained he has been participating in this middle-man style behavior for approximately 10 years. WILLIAMS said the most cocaine base he would obtain for others was one "8-ball" and typically 1-2 grams. I know through my training and experience an "8-ball" of cocaine base to refer to approximately 1/8 of an ounce. WILLIAMS explained that, when the people he knew wished to obtain cocaine base, sometimes they would contact him via phone to arrange the transaction. WILLIAMS provided his cellular phone number as 802-383-8151. WILLIAMS said he has been using 802-383-8151 for approximately two years. I found 802-383-8151 was the same phone number as used in the initial controlled purchase in December 2019. WILLIAMS advised that DEVICE 1 was still at his residence. I asked WILLIAMS for consent to search DEVICE 1, but WILLIAMS refused.

13. During his interview, WILLIAMS provided three individuals who he identified as his source of supply for cocaine base: "Candy," who WILLIAMS identified as a white female. WILLIAMS said he believed "Candy's" phone number was in DEVICE 1; "Anthony," who was a younger white male; and "Fish," who was a tall black male.

14. WILLIAMS said he has been residing at 42 N. Winooski Ave., Unit 4, Burlington, Vermont for about 2-3 years along with FITZPATRICK, who WILLIAMS identified as his "wife," although WILLIAMS added that they were not married. WILLIAMS explained he met FITZPATRICK in about 2009-2010.

15. TFO Tremblay and I went back to 42 N. Winooski Ave. and met with FITZPATRICK. From outside the building located at 42 N. Winooski Ave., TFO Tremblay called FITZPATRICK. TFO Tremblay explained to FITZPATRICK that we needed to obtain WILLIAM's phone and, although WILLIAMS had not stated as such, that WILLIAM's needed

some phone numbers from it. FITZPATRICK then opened the common door to 42 N. Winooski Ave. and was holding her cellular phone as well as another cellular phone (later identified as DEVICE 1). FITZPATRICK stated that she believed the other cellular phone belonged to WILLIAMS and provided that cellular phone (DEVICE 1) to TFO Tremblay. TFO Tremblay and I returned to the Burlington Police Department, where TFO Tremblay called 802-383-8151 and found DEVICE 1 rang, showing an incoming call. As I placed DEVICE 1 into airplane mode, I observed the main screen showed an Instagram (social media application) notification for "edwardwilliams2433."

16.     At the conclusion of the interview with WILLIAMS, I explained that we had possession of his cellular phone (DEVICE 1) and that we would maintain custody of it. I asked WILLIAMS if he wished to obtain any phone numbers or information from his phone. WILLIAMS said he would, and entered in a passcode, unlocking DEVICE 1. At WILLIAMS' request, I obtained multiple telephone numbers from his contact listing in DEVICE 1. DEVICE 1 was then secured as evidence at the Burlington Police Department, property tag number 72829.

17.     On 08/17/2021, I completed an administrative subpoena to AT&T for the cellular phone number 802-383-8151. I received the subpoena return and later reviewed it. I found the phone number to list the financial liable party as WILLIAMS. I found the activation date to be 08/20/2013.

## TRAINING AND EXPERIENCE

18.     Based upon my training and experience, I also know the following information related to controlled substance violations:

   a. Persons who participate in the distribution of controlled substances frequently use cellular telephones, among other communication devices, to coordinate their

      unlawful activities and to maintain contact with suppliers and consumers of illegal drugs.

    b. I know that information stored in the memories of these communications devices constitutes evidence of drug trafficking and/or the illegal movement of currency. Among other things, the evidence may contain the telephone numbers assigned to the communication devices, messages received by or sent from the devices, identification numbers and other information contained in their electronic memories, and the records of telephone numbers to which calls were placed and from which calls were received.

    c. With their cellular phones, illegal drug distributors often take photographs of other members of their organizations, assets obtained from profits of drug sales, locations associated with their illegal activity, and other useful evidence.

    d. Data contained in a cellular phone may reveal the physical location of the cell phone at various times. For example, if a cellular phone has Global Positioning System ("GPS") capabilities, additional information regarding locations of the phone, may be recovered from the device.

## TERMINOLOGY

19. Based on my training and experience, I know the following technical information about mobile devices:

    a. Smartphones/cell phones are electronic devices (hereafter "devices") that contain a logic processing unit, an input/output capability, memory, and a radio antenna that permits the device to place and receive telephone calls and send and receive text or other data messages via the cellular network. These devices contain

memory in several forms and locations. The most common form of memory is solid-state (as opposed to a hard drive, which is a spinning disc). Solid-state memory typically consists of a dense array of diodes that can hold tens of gigabytes of information. Most solid-state memory on a smartphone device is considered "non-volatile," meaning that data can remain in storage even when the device is powered-down by the user. By contrast, "volatile" memory is a short-term form of memory that exists only when the device is turned on. These devices often contain memory in other locations, including removable SD cards, SIM cards, video cards, logic boards, and other microchips that maintain data in memory to perform their specific function within the phone. The scope of this warrant application is a search of all volatile and non-volatile memory contained within the devices. Allowing a search of the device described in Attachment A may reveal evidence of communication between the device's user and others relevant to this investigation.

b. Modern smartphone devices, including the device described in Attachment A, are capable of tracking and recording the device location data. For example, certain smartphone devices track the device's location, including through GPS, Bluetooth, and crowd-sourced Wi-Fi hotspots and cell tower locations. Certain smartphone devices and third-party applications gather and use information based on the current location of the device to provide a variety of location-based services. For example, an application might use the device location data and location search query to help the user find nearby coffee shops or theaters, or the device may set its time zone automatically based on the current location.

      Allowing a search of the device described in <u>Attachment A</u> may reveal the date, time, and location of the device at any particular time relevant to this investigation.

c. In addition, many applications utilized by smartphones track location data. For example, when a photograph is taken with a smartphone device, the location of the device along with the date and time the photograph was taken is often stored in the metadata of the digital photograph file. Allowing a search of the device described in <u>Attachment A</u> may reveal the date, time, and location the device was used when a particular application was utilized.

d. Modern smartphone devices have widely varying memory capacities, ranging from less than one gigabyte of total memory to tens of gigabytes. To put this in perspective, 1 gigabyte of data is approximately 220,000 printed pages of text. The average smartphone is equipped with an average of 8 gigabytes of internal storage capacity and regularly up to a capacity of 256 gigabytes of internal storage capacity. Many smartphone models are also designed to accommodate a second data storage location. A user may elect to install any number of memory cards that can increase the capacity of the smartphone device beyond 256 gigabytes of storage capacity. Often times these secondary data storage memory cards are supplied by the manufacturer at the time the device is purchased. To place this into perspective, this storage capacity is equivalent or exceeds the internal storage capacity of many laptop computers.

e. When smartphone users access, create, or modify files or data, the device memorializes that event in memory in some form. This memorialization of user

10

activity ranges from the highly intuitive (an email drafted by the user is saved in the "drafts" folder of an email application) to that which only an expert might appreciate (the mere act of using the device can cause its operating system to reallocate files to new locations within memory). Files or data which have been created, accessed, downloaded, or saved by a user may be located by a trained examiner in predictable locations within a device. In some instances, files flagged for deletion by a user or otherwise "discarded" may still be retrieved by a trained forensic examiner. Given the sheer volume of available memory, it is quite likely that a file may still exist months or years after its user last accessed it.

f.  Files that have been accessed or downloaded via the Internet onto a device are typically automatically downloaded into a temporary Internet directory or "cache." The web browser often maintains a fixed amount of non-volatile memory devoted to these files, and the files are overwritten as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them. Internet browser cache and temporary files may contain data ranging from images to the content of websites visited. Thus, the data/files gleaned from browser cache and temporary files may be as diverse as the user(s) internet usage and will tend to reflect the user(s)' internet usage.

g.  Although there are several popular operating systems in use on today's smartphone devices (for example: Apple iOS, Android, and Windows), and each operating system has several versions, it is often the case that such devices maintain files that memorialize their user's patterns of life, to include the contents of locally-stored and web-accessed emails, the contents of web-based social

11

networking communication, SMS/MMS "text" messages, call logs, contact lists, information retained by applications utilized by the user, and local (non-web-based) content created, modified, or saved by the user. A trained forensic computer examiner may employ a variety of methods to locate such files and data. Allowing a search of the device described in <u>Attachment A</u> may reveal the content of communication between the device user and others relevant to this investigation.

20. Based on my training, experience, and research, I know that DEVICE 1, has capabilities that allows it to serve as a smart phone, digital camera, and Global Positioning System (GPS), and that DEVICE 1 can access the internet, among other capabilities. In my training and experience, examining data stored on devices such as DEVICE 1 can uncover, among other things, evidence that reveals or suggests user attribution.

## **ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

21. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. This information can often be recovered with forensics tools.

22. As further described in <u>Attachment B</u>, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how DEVICE 1 was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on DEVICE 1 because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a deleted text message).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be reviewed by a team and passed along to investigators. Whether data stored on a device constitutes evidence may depend on other information stored on the device and the application of knowledge about the investigation. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

23. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit later review of the media or information obtained from the warrant

execution. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the devices to human inspection in order to determine whether it is evidence described by the warrant.

24. Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## REQUEST FOR SEALING

25. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

## CONCLUSION

26. I respectfully submit that this affidavit supports probable cause for a search warrant authorizing the examination of DEVICE 1 described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

_____
Frank Scalise
Task Force Officer
Drug Enforcement Administration

Subscribed and sworn to before me on August 26, 2021

_____
HONORABLE KEVIN J. DOYLE
UNITED STATES MAGISTRATE JUDGE